IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DELONTE JORDAN, #362-617,     *

Petitioner,     *

    v.     *   Civil Action No. JKB-16-2807

STATE OF MARYLAND,     *

Respondent.     *

                               ***

## MEMORANDUM OPINION

On August 8, 2016, Petitioner Delonte Jordan, filed the instant 28 U.S.C. § 2254 habeas corpus application attacking his conviction and sentence for armed robbery, conspiracy to commit armed robbery, and second-degree assault entered in the Circuit Court for Montgomery County. ECF 1.[1] Respondents filed an Answer arguing that Jordan's sole claim regarding the sufficiency of the evidence has been procedurally defaulted and he is otherwise not entitled to habeas relief. ECF 6. Jordan was notified of his right to file a reply. ECF 7. Jordan filed a reply solely arguing that the prosecutor improperly commented on his failure to testify, a claim not raised in his initial petition. ECF 8. The Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (Petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons to follow, the Petition will be denied and dismissed with prejudice.

---

[1] Citation is to the Court's electronic docket.

**Background and Procedural History**

On August 20, 2009, Jordan was indicted on charges of armed robbery, conspiracy to commit armed robbery, and second-degree assault. ECF 6-1. The events giving rise to these charges, as summarized by the Court of Special Appeals of Maryland, follow:

> The State's theory of prosecution was that during the early morning hours of July 22, 2009, three men, appellants [Francis Mbewe and Delonte Jordan] and Demetris Henry, robbed a 7-Eleven convenience store in Silver Spring. During the robbery, Mbewe watched the front door of the store, Jordan pointed a gun at the store clerk, and Henry took the money from the register. Because the robbers covered their faces with t-shirts, eyewitnesses to the robbery were unable to identify them. The State's evidence consisted of circumstantial evidence, including the expert testimony of a K-9 tracker. The defense argued lack of criminal agency. Appellant Mbewe was the sole witness for the defense. Viewing the evidence in the light most favorable to the State, the prevailing party, the following was elicited at trial.
>
> Around 5:40 a.m. on July 22, 2009, the 7-Eleven convenience store at the corner of Briggs Chaney Road and Old Columbia Pike was robbed. A store clerk and two patrons inside the store and one patron outside the store at the time of the robbery testified for the State.[3] The store clerk testified that he was standing next to the cash register when three men entered the store with t-shirts covering their heads, hiding their faces. The clerk testified that the first man stood in front of the counter and pointed a gun at him; the second man jumped over the counter and ran up to him; and the third man stood near the front door. The robber who had jumped over the counter hit the clerk in the head a few times and demanded that he open the register. The clerk did as he was told. That robber took what was later determined to be $45.43 from the register. The robbers then fled.
>
> A store patron testified that he was at the back of the store when he heard a lot of commotion and observed three men robbing the store. The men had t-shirts over their faces; two of the men wore black t-shirts, one of the men wore what the patron thought was a white t-shirt. A second patron testified that he was near the front door when three black men with shirts covering their heads rushed into the store. He tried to exit the store but the third robber told him to "get down, get down." The patron apparently did not move fast enough so that robber stomped on him two or three times, forcing him to the ground. Around this time, a third patron had pulled into the parking lot of the store. As she was getting out of her car, she saw three men run out of the store with t-shirts over their heads. Two of the men had black t-shirts over their heads; one had a white t-shirt. She

saw the three men run to the left of the store and down an embankment that led to some woods.

The robbery took less than 30 seconds. Neither the clerk nor the three patrons were able to identify the robbers. The store surveillance system recorded the robbery. The tape was played for the jury and admitted into evidence as well as photographs from the tape. The tape and photographs showed a black man wearing a white sleeveless shirt with a light gray shirt covering his head running into the store with a gun. It showed a second black man without a shirt on but with a black t-shirt covering his head jump onto the counter to get to the register. Because of the angle of the camera, the third robber was not shown on the film. After the robbers fled, the store clerk immediately called the police, who responded within five minutes. Based on the officers' conversations with the clerk and patrons, the police broadcast a description of the robbers and secured the perimeter of the building.

Corporal Paul Kukucka, a fifteen-year veteran with the Montgomery County K-9 unit, and Saber, his German Shepherd, arrived shortly thereafter. Corporal Kukucka testified extensively as to his and Saber's training and experiences in tracking. Corporal Kukucka, who was accepted as an expert in the field of K-9 tracking, explained that he and Saber initially went through 14 weeks of training, and that every three weeks they reinforce their skills by attending a ten-hour class. Additionally, they spend six hours every month refreshing their skills.

The corporal testified that humans lose skin cells at a rate of 40,000 per minute, and his dog tracks scent from the skin cells and crushed vegetation. Corporal Kukucka explained that when brought to an area to track, he places his dog in a tracking harness that has a twenty-foot line. The tracking harness signals to the dog that he is to track. The long lead line requires the dog to pull the corporal hard to signal the corporal to follow him.

Corporal Kukucka testified that after he was given a description of the suspects and the area where the suspects were last seen fleeing, he retrieved Saber from his car, put him in his harness, and brought him to the left of the building. It was just after 6:00 a.m. and the day was clear. He instructed Saber to track, and the dog began to do so "immediately." The corporal testified that it was a fresh scent, explaining:

> Having an area where you respond to the scene within a reasonable
> amount of time, and I consider this an extremely reasonable
> amount of time, and you put the dog down. And when he starts to
> pick up on something immediately, it's a fresh, it's a fresh scent.

3

Corporal Kukucka testified that Saber pulled him behind the 7-Eleven to a fence line leading to some woods. The dog started to "air scent," raising his head in the air to catch the scent. The corporal added that a scent blown off an object creates a cone of scent and a dog will move from side to side trying to pinpoint the object.

Corporal Kukucka testified that after air scenting, Saber started moving toward the wooded area. The Corporal looked up and saw three black men looking at him while hiding in the wooded area behind a tree. Two of the men were wearing dark t-shirts, one was wearing a light-colored t-shirt. The corporal announced, "Montgomery County Police K-9, stop, or I'm going to release the dog." The men fled deeper into the woods. The corporal radioed his location to other officers in the area and Saber began tracking again. Saber tracked through the woods and into a field. At that point, the corporal heard rustling as if someone was going back into the woods. The corporal explained why he continued to follow his dog and not to force his dog to follow the rustling noise:

> Because there's one thing that a good K-9 will always do, and every instructor will always tell you is, always trust your dog, trust, trust your dog. So, he was on an active, he was on an active scent, I didn't want to pull him off it to check out the noise. . . .
>
> So, trusting my dog, I stayed with him, since he was working an active scent[.]

The corporal and Saber continued to track the suspects through the field and into a residential area. When they were about 40 yards from the back of a house, the corporal saw two of the three men he had seen earlier "hunched" down behind a support column underneath a deck. As the corporal got closer, he gave another K-9 warning but the two men again fled. The corporal again radioed his location, and he and Saber continued to track the suspects. Saber tracked the suspects across several residential streets when the corporal saw the two men running toward a wood pile. The suspect wearing a white t-shirt hid behind the wood pile while the suspect wearing a light gray t-shirt continued running. Other officers arrived on the scene and while one officer arrested Jordan behind the wood pile, another arrested Mbewe, who had run a short distance further.

The chase had lasted about an hour and the suspects were arrested near a residential community next to the strip mall in which the 7-Eleven was located. The police took pictures of the men upon their arrest. The men were then taken to a police station and searched. The police recovered $95 from Jordan's person. Both men smelled of alcohol.

4

Corporal Kukucka testified that after Jordan and Mbewe were arrested, Saber rested while other K-9 units searched the area for the third suspect and the gun. They found neither. Corporal Kukucka then had Saber search the area for items that might have been involved in the robbery. During that search, they discovered an encampment about 100 yards to the left from where the corporal had given the suspects his first K-9 warning. The encampment contained a chair, a couple of crates to sit on, a fire pit, and a couple of hundred beer cans. Corporal Kukucka testified that Saber never alerted to the area while tracking the suspects, and when Saber was in the encampment he showed "no interest whatsoever of any scent in that area[.]"

Corporal Kukucka testified that in his expert opinion Saber picked up the robbers scent from the 7- Eleven and had never lost it. The corporal identified the appellants in court as the two suspects he had tracked. The 7-Eleven manager testified that he was familiar with the appellants – they were patrons of his store. No usable fingerprints were found at the crime scene but a shoe print was taken from the counter where the second robber had jumped onto the counter to get to the cash register. Demetris Henry was arrested two days later. The print from Henry's shoe was compatible with the print taken from the counter.

Mbewe was the only witness to testify for the defense. He admitted to recent prior convictions for statutory rape and distributing marijuana. He testified that at the time of the robbery, he had charges pending against him and that he lived at the encampment. He explained that because of the pending charges, his mother had filed a protective order against him so he could not live at her home. The night before the robbery, he and a group of six to eight men were drinking at the encampment. He admitted to knowing both Jordan and Henry. Jordan was at the gathering; Henry was not. At some point, Mbewe fell asleep in a chair but was awoken when he heard Corporal Kukucka issue his K-9 warning. He ran because he thought he might be arrested – he had been drinking underage (he was 19 years old) and he did not want his Pretrial Services "to violate him" because he was not living with his mother. According to Mbewe, he ran only a couple of yards before stopping, and while running he noticed that Jordan was running alongside of him. On cross-examination, Mbewe admitted that when he was arrested he had lied to the police and told them he did not know Jordan.

---

[3] A second store clerk ran unnoticed into the office when the three robbers entered the store.

ECF 6-11 pp. 1-7.

After a jury trial in the Circuit Court for Montgomery County, Jordan was convicted of armed robbery, conspiracy to commit armed robbery, and second-degree assault. *Id*. at 1; ECF 6-7. On April 20, 2010, Jordan was sentenced to an aggregate fifteen years' imprisonment. ECF 6-8.

Jordan filed a timely Notice of Appeal, along with his co-defendant Francis Mbewe, arguing that the evidence was insufficient to sustain his convictions; the trial court erred when it responded to a jury question asking about whether there could be a hung jury on the guilt of Francis Mbewe; and that the prosecutor improperly commented on Jordan's failure to testify. ECF 6-9 at 2. In an unreported opinion filed on October 12, 2011, the Court of Special Appeals affirmed Jordan's judgments of conviction. ECF 6-11. Jordan's petition for writ of certiorari to the Maryland Court of Appeals raised only the issue regarding whether the trial court erred in responding to the jury note. ECF 6-12. The Court of Appeals denied the petition on January 23, 2012. *Id*.

Jordan filed a *pro se* petition for post-conviction in the circuit court on October 12, 2011. ECF 6-1. As grounds for relief, Jordan argued that there were issues with his identification; the trial judge played "music chairs in middle of trial"; the trial judge "abused her discretion in failure to act"; and the prosecutor engaged in misconduct regarding Jordan's failure to testify. ECF 1 at p. 2. A hearing on the petition was held on February 27, 2014, and the petition was denied on November 9, 2015. ECF 6-1. Jordan's application for leave to appeal the denial of post-conviction relief was denied by the Maryland Court of Special Appeals on July 26, 2016. *Id*.

Jordan filed his federal Petition on August 8, 2016,[2] alleging solely that the evidence was insufficient to support his conviction. ECF 1 at p. 2. In support of his contention, Jordan maintains that the state's theory of the case was that he was the man with the gun in front of the counter but none of the eyewitnesses to the robbery were able to identify him. He claims that the only evidence that he committed the robbery at the 7-Eleven was his presence in the woods behind the store twenty minutes after the robbery. *Id*. He claims that this evidence was insufficient to prove beyond a reasonable doubt that he was the perpetrator of the crime. *Id*.

Respondents filed a response to the petition. ECF 6. Jordan was afforded the opportunity to file a reply (ECF 7), which he did, raising a new claim, that of prosecutorial misconduct due to the prosecutor improperly commenting on his failure to testify at trial.[3] ECF 8. Jordan did not respond to the argument that his claim regarding sufficiency of the evidence was procedurally defaulted.

---

[2] The Petition is dated August 2, 2016, and is deemed filed on that date. *See Houston v. Lack*, 487 U.S. 266, 276 (1988).

[3] This allegation of error was not raised in the initial Petition, but rather was raised for the first time in Jordan's Reply. The claim is not properly before the Court.

Even if this claim were before the Court, Jordan would be entitled to no relief. First, Jordan has clearly defaulted the claim by failing to raise the issue in his petition for writ of certiorari filed in the Maryland Court of Appeals. On the merits, Jordan's claim would also fail as undesirable remarks by the prosecution do not necessarily mandate a new trial, unless they so infect the trial with unfairness that the resulting conviction is a denial of due process. *See Darden v. Wainwright*, 477 U.S. 168 (1986), *United States v. Weatherless*, 734 F.2d 179 (4th Cir. 1994). In determining whether improper prosecutorial comments so damaged the trial as to require reversal, this court must consider (1) the degree to which the comments misled the jury and prejudiced the accused; (2) whether the comments were isolated or extensive; (3) whether competent proof established guilt, irrespective of the comments; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. *See United States v. Harrison*, 716 F.2d 1050 (4th Cir. 1983); *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984). Jordan argues that the prosecutor improperly commented on his failure to testify during closing arguments. The appellate court's rejection of this argument is deemed presumptively correct, pursuant to 28 U.S.C. § 2254(d) and (e).

## Applicable Legal Standard

Section 2254 states that a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### I.  Threshold Considerations

#### A. Exhaustion

The exhaustion doctrine, codified at 28 U.S.C. § 2254(b)(1),[4] "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.  Under our federal system, the federal and state courts [are] equally bound to guard and protect rights secured by the Constitution."  *Rose v. Lundy*, 455 U.S. 509, 518 (1982) (alteration in original) (internal citations and quotation marks omitted).  Moreover, "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation ...."  *Id.*  Thus, the *Rose* Court cautioned litigants, "before you bring any claims to federal court, be sure that you first have taken each one to state court."  *Id.* at 520; *see also O'Sullivan v.*

---

[4] Section 2254(b)(1) states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
> (A)  The applicant has exhausted the remedies available in the courts of the State; or
> (B)  (i) there is an absence of available State corrective process; or
>      (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
> (C)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the state, within the meaning of this section, if he has the right under the law of the state to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1).

*Boerckel*, 526 U.S. 838, 839 (1999) ("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.").

### B. Procedural Default

In *O'Sullivan*, the Supreme Court stated: "To ... 'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts." 526 U.S. at 848 (internal citation omitted); *see also id.* at 844 ("Section 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims."). The inquiry, then, is "[w]hether a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort has *properly* presented his claims to the state courts. ... Because we answer this question 'no,' we conclude that [petitioner] has procedurally defaulted his claims." *Id.* at 848. Stated differently, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. The *O'Sullivan* Court noted, however,:

> In this regard, we note that nothing in our decision today requires the exhaustion of any specific state remedy when a State has provided that that remedy is unavailable. Section 2254(c), in fact, directs federal courts to consider whether a habeas petitioner has "*the right under the law of the State to raise, by any available procedure,* the question presented." (Emphasis added.) The exhaustion doctrine, in other words, turns on an inquiry into what procedures are "available" under state law. In sum, there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available.

*Id.* at 847-48; *see also Breard v. Pruett*, 134 F.3d 615, 619 (1998) (quoting *Coleman v. Thompson*, 501 U.S. 722, 375 n.1 (1991)) ("A procedural default also occurs when a habeas

9

petitioner fails to exhaust available State remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'").[5]

When a claim is procedurally defaulted, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that failure to consider the claim on the merits would result in a fundamental miscarriage of justice, *i.e.*, the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S 478, 495-96 (1986). "Cause" consists of "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in State court at the appropriate time." *Breard,* 134 F.3d 615, 620 (4th Cir. 1998) (quoting *Carrier*, 477 U.S. at 488)). In order to demonstrate prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see also Carrier*, 477 U.S. at 494 (quoting *Frady*). Even when a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

**II. Analysis Framework**

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable

---

[5] A procedural default may also occur when a state court declines "to consider the[] merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Breard*, 134 F.3d at 619.

application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state adjudication is "contrary to" clearly established federal law under § 2254(d)(1) where the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application analysis," a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough. v Alvarado*, 541 U.S. 652, 664 (2004)). In other words, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.*

Further, "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an

evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe*, 593 F.3d at 378. This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.*

**Discussion**

Jordan seeks habeas corpus relief based on a claim that the evidence was insufficient to sustain his conviction. Respondent argues that Jordan's claim is procedurally defaulted and/or fails on the merits. ECF 6.

**I. Procedural Default**

Jordan clearly defaulted the claim he attempts to assert here by failing to raise the sufficiency of the evidence claim in his petition for writ of certiorari filed in the Maryland Court of Appeals. Additionally, despite being provided an opportunity to do so, Jordan has failed to offer any explanation regarding cause and prejudice or actual innocence that could excuse the procedural default of his claims. As such, the claim is denied and dismissed as procedurally defaulted.

**II. Merits of Claim**

Even if the sufficiency of the evidence claim had not been procedurally defaulted, Jordan would be entitled to no relief. The Maryland Court of Special Appeals considered and rejected Jordan's claim regarding the sufficiency of the evidence, finding,

> Appellants argue that there was insufficient evidence of criminal agency to support their convictions. Appellants argue that the "only" evidence linking them to the robbery "was their presence in the woods behind the store twenty minutes after the robbery[.]"

Appellants argue that that evidence was insufficient to sustain their convictions because it was consistent with a reasonable hypothesis of innocence, given Mbewe's testimony regarding their presence at the encampment behind the store.

When reviewing the sufficiency of the evidence, our task is to determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Taylor v. State*, 346 Md. 452, 457 (1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). The limited question before an appellate court "is not whether the evidence should have or probably would have persuaded the majority of fact finders but only whether it possibly could have persuaded any rational fact finder." *Fraidin v. State*, 85 Md. App. 231, 241, *cert. denied*, 322 Md., 614 (1991) (emphasis in original). "[W]e [] determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Bryant v. State*, 142 Md. App. 604, 622-23, *cert. denied*, 369 Md. 179 (2002). The appellate court does not weigh the evidence or judge the credibility of the witnesses, as that is the responsibility of the trier of fact. *Id.* Contradictions in testimony go to the weight of the testimony and credibility of the evidence, rather than its sufficiency. *State v. Stanley*, 351 Md. 733, 750 (1998) (citing *Binnie v. State*, 321 Md. 572, 580 (1991)). *See also Longshore v. State*, 399 Md. 486, 499-500 (2007).

Appellants['] "reasonable hypothesis of innocence" argument is plainly not applicable here because the State's evidence consisted of more than a single strand of circumstantial evidence. As we explained in *Jensen v. State*, 127 Md. App. 103 (1999), the principle applies only in those few instances where the evidence at trial consists of a "single strand" of circumstantial evidence. *Jensen*, 127 Md. App. at 117-19. We explained that where the evidence consists of multiple strands that reinforce and corroborate each other, the principle is inapplicable. *Id.* at 120.

Here there were multiple strands of circumstantial evidence. Within minutes of the robbery, an experienced K-9 handler and his dog were on the scene. Corporal Kukucka explained that Saber "immediately" went into tracking mode when brought to the side of the 7-Eleven where the three robbers were last seen fleeing the store. The corporal explained that during the chase he saw appellants hiding behind a tree and then a deck column, and that each time he gave his K-9 warning, appellants fled. *Decker v. State*, 408 Md. 631, 640 (2009) (recognizing that consciousness of guilt can be inferred from flight and hiding from justice after a crime). Additionally, the jury could infer that the man on the surveillance video brandishing a weapon and wearing a white sleeveless t-shirt

13

with a gray t-shirt covering his head was Jordan based on his clothes and his build. Moreover, the jury was free to believe part of Mbewe's testimony – that he knew Jordan and Henry and that he was with Jordan the night before the robbery – but to disregard other parts – that he was sleeping in the chair of the encampment when he heard the corporal's K-9 warning or that he fled from police because he had been drinking and could get in trouble for being homeless. The State presented other pieces of circumstantial evidence as well – Mbewe's clothes and build when arrested matched those of the second robber as described by the patrons and from the surveillance video, and the footprint recovered from the counter top matched Henry's shoe print when he was arrested two days after the robbery.

Under the circumstances, we are persuaded that in viewing all the strands of circumstantial evidence in the light most favorable to the State, the evidence was more than sufficient to sustain appellants' convictions.

ECF 6-11 at pp. 7-12.

As discussed by the Maryland Court of Appeals, the standard of review for a sufficiency of the evidence claim on habeas corpus is whether, after viewing evidence in a light most favorable to the prosecution, any rational trier of fact could find essential elements of crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This Court must consider circumstantial as well as direct evidence and allow the government the benefit of all reasonable inferences from the facts proven to the facts sought to be established. *United States v. Tresvant*, 677 F.2d 1018 (4th Cir. 1982). The determination of the credibility of each witness is within the sole province of the jury and is not susceptible to review. *United States v. Saunders*, 886 F.2d 56 (4th Cir. 1989); *Pigford v. United States*, 518 F.2d 831 (4th Cir. 1975). The Maryland Court of Special Appeals's discussion of the facts adduced during Jordan's trial is supported by the record in this case. Mbewe and Kukucha's testimony, coupled with the surveillance video on the robbery, provided sufficient evidence for the jury to find Jordan had been one of the men who robbed the 7-Eleven. The Maryland Court of Special Appeals's

14

determination of the facts in Jordan's case as well as its discussion of the law regarding sufficiency of the evidence are supported by the record, are not unreasonable applications of federal law as determined by the Supreme Court, survive scrutiny, and shall not be disturbed.

**CERTIFICATE OF APPEALABILITY**

Under the amendments to Rule 11(a) of the Rules Governing Proceedings under Section 2254 "the district court must issue or deny a certificate of appealability [COA] when it enters a final order adverse to the applicant…If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S. Ct. 759, 773 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274. 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Jordan has failed to make a substantial showing that he was denied a constitutional right, and the court finds that reasonable jurists would not find the denial of habeas relief in this case debatable. Accordingly, a certificate of appealability shall not issue.[6]

**CONCLUSION**

For the above reasons, the court concludes that Jordan's Petition provides no grounds for habeas corpus relief. Accordingly, the Petition will be denied and dismissed.

---

[6] Denial of a certificate of appealability in the district court does not preclude Jordan from requesting one from the court of appeals.

A separate Order follows.

Dated this 13th day of March, 2019.

FOR THE COURT:

_____/s/_____
James K. Bredar
Chief Judge